UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THIA J. BROWN, )
 )
      Plaintiff, )
 )
v. ) Case No. 12-cv-1170 (RJL)
 )
HARTFORD LIFE AND ACCIDENT )
INSURANCE COMPANY, )
 )
      Defendant. )

**MEMORANDUM OPINION**
(January **27**, 2014) [Dkt. ##27, 29]

Plaintiff Thia Jai Brown ("plaintiff" or "Brown") brings this case against Hartford Life and Accident Insurance Company ("defendant" or "Hartford"), challenging the termination of her benefits under a Long Term Disability ("LTD") insurance policy. *See* Compl. [Dkt. #1]. Hartford filed a counterclaim alleging that Brown was in fact *over*paid and therefore owes Hartford more than $36,000. *See* Answer with Affirmative Defenses and Countercl. ("Answer") ¶¶ 51–74 [Dkt. #15]; Def. Hartford Life and Accident Ins. Co.'s Mem. of Law in Supp. of Its Mot. for Summ. J. ("Def.'s Mem.") at 25–26 [Dkt. #28].[1] Both parties have moved for summary judgment. *See* Def. Hartford Life and Accident Ins. Co.'s Mot. for Summ. J. [Dkt. #27]; Mot. for Summ. J. as to Pl.'s Compl. and Def.'s Countercl. [Dkt. #29]. Upon consideration of the parties' pleadings, relevant

---

[1] Hartford's counterclaim says the overpayment totaled $32,907.41, *see* Answer at 65; however, defendant's brief in support of summary judgment and an attached affidavit explain that the amount is actually $36,473.40, *see* Def.'s Mem. at 25–26; Aff. of Laurie Tubbs at 1–2 [Dkt. #28-1]. Because the explanation in the affidavit makes sense—and because plaintiff does not dispute its accuracy—I will treat that as the correct figure.

law, and the entire record therein, the plaintiff's motion is DENIED and the defendant's motion is GRANTED.

## BACKGROUND

Brown is a 38-year-old histotechnologist,[2] who worked for Universal Health Services, Inc. ("Universal") from March 11, 2002 through July 12, 2008, *see* Compl. ¶ 9; HLI00594, and was covered by Universal's ERISA-qualified Group Benefit Plan, HLI0020–63. Plaintiff stopped working on July 12, 2008 and applied for LTD benefits two months later, citing "chronic swelling and pain" in her feet and legs. HLI0531–33. Her physician, Dr. Andrew Lee, diagnosed her with synovitis of unclear etiology[3] and sarcoidosis.[4] HLI0369. On January 27, 2009, Hartford approved plaintiff's application and awarded her monthly benefits of $2,331.68, retroactive to January 11. HLI0210–14.

From October 2008 through March 2011, plaintiff's rheumatologist was Dr.

---

[2] "Histology" is "the study of the microscopic structure of tissues." NEW OXFORD AM. DICTIONARY 801 (2d ed. 2005) [hereinafter NEW OXFORD]. "Histotechnicians (HTs) and histotechnologists (HTLs) are members of a laboratory team who employ histologic technology to diagnose diseases, to conduct research, or to instruct others in the science." *What Is Histotechnology?*, NAT'L SOCIETY FOR HISTOTECHNOLOGY, http://www.nsh.org/what-histotechnology (last visited Oct. 31, 2013).

[3] "Synovitis" is the "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." STEDMAN'S MEDICAL DICTIONARY 1773 (27th ed. 2000) [hereinafter STEDMAN'S]. "Synovial" means "relating to or denoting a type of joint that is surrounded by a thick flexible membrane forming a sac into which is secreted a viscous fluid that lubricates the joint." NEW OXFORD at 1713. "Etiology" is a fancy way of saying "cause." *Id.* at 579.

[4] "Sarcoidosis" is "a chronic disease of unknown cause characterized by the enlargement of lymph nodes in many parts of the body and the widespread appearance of granulomas [*i.e.*, masses of tissue typically produced in response to infection, inflammation, or the presence of a foreign substance] . . . ." NEW OXFORD at 1504; *id.* at 734.

2

Thomas Grader-Beck. HLI0516–18; HLI0296–99. In that time, Dr. Grader-Beck treated plaintiff's sarcoidosis and an array of other medical conditions not now at issue.[5]

In September 2009, however, Hartford became suspicious that Brown was engaged in physical activities that she had not reported to the insurance company or to her doctor. On September 22, plaintiff sent Hartford a facsimile that indicated it came from "Sweet Jai's Catering" (Jai being plaintiff's middle name). HLI0405. Three weeks later, on October 14, 2009, a Hartford Ability Analyst spoke with Brown on the phone. HLI0010. During the call, the analyst "could hear a baby in the background," *id.*, and it "[s]ounded like [Brown] was holding [the] baby as it was very close to phone and could be heard making noises throughout entire phone call," HLI0404. When asked about the

---

[5] For instance, at various points, Dr. Grader-Beck diagnosed or found signs of:
- ankle arthritis;
- erythema nodosum, which is "an [inflammation of fat tissue beneath the skin] marked by the sudden formation of painful nodes on the extensor surfaces of the lower extremities, with lesions that are self-limiting but tend to recur," STEDMAN'S at 616; *see also id.* at 28, 1304, 1715;
- Reynaud's, which "is a condition that affects the blood vessels in the extremities—generally, the fingers and toes[—and is] characterized by episodic attacks . . . in which the blood vessels in the digits (fingers and toes) constrict (narrow), usually in response to cold temperatures and/or emotional stress," *Questions and Answers About Reynaud's Phenomenon*, NAT'L INST. OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES, http://www.niams.nih.gov/Health_Info/Raynauds_Phenomenon/default.asp (last visited Oct. 31, 2013);
- peripheral edema, which is "[a]n accumulation of an excessive amount of watery fluid in cells or intercellular tissues" in the feet and legs, STEDMAN'S at 566–67; *Edema*, MEDICINENET, http://www.medicinenet.com/edema/article.htm (last visited Oct. 31, 2013); and
- hypertension, which is an "abnormally high blood pressure" or "a state of great psychological stress," NEW OXFORD at 833.

See HLI0517 (Oct. 2, 2008 report); HLI0511 (Jan. 29, 2009 report). Plaintiff does not rely on any of these diagnoses or ailments in this lawsuit. Rather, she focuses entirely on a subsequent diagnosis of fibromyalgia. *See infra* note 7 and accompanying text.

3

baby, Brown claimed "someone was visiting her." HLI0010. At the time, she claimed she was "unable to do any part of her job and she does nothing at home; only takes a bath and sometimes reads and watches TV" and that "she [was] not receiv[ing] any other income." *Id.* Unpersuaded, Hartford referred plaintiff's case to its Special Investigation Unit. HLI0404.

Hartford hired two firms to surveil Brown for four days in November and December 2009. HLICIU0651–60. On all four days, investigators observed an unidentified female drive up to plaintiff's home between 7:25 and 7:55 AM and leave a small child inside. HLICIU0654–60. The child remained with plaintiff until at least 4:00 PM when the surveillance ended. *Id.* In addition, on November 3, the investigators observed a neighbor enter Brown's residence at about 11:30 AM, at which time Brown walked to her car, drove to a Safeway supermarket, walked around the store, went into a CVS pharmacy next door, purchased baby-related items, drove back to her residence, and walked back inside while carrying a shopping bag in one hand and her cell phone in the other. HLICIU0655–56. About an hour later, two unidentified males visited Brown and left carrying Styrofoam food trays and a beverage cup. HLICIU0656. As the men were leaving, Brown was "holding a child near the front door," then placed the child down, "exited the residence and began to run towards the vehicle the two males were occupying." *Id.* The investigator concluded that although "[t]here was no evidence of the subject working at a catering company or at any company[,] . . . it appeared as if the subject may be possibl[y] selling food out of the residence." HLICIU0657.

4

On January 4, 2010, the Social Security Administration ("SSA") denied Brown's application for disability benefits because "[t]he medical evidence show[ed] that [she was] responding to treatment and . . . able to carry out [her] activities of daily living without assistance." HLI0465. According to the SSA, plaintiff "should be capable of work which is not physically demanding," and her "condition [was] not severe enough to keep [her] from working." *Id.* Hartford arranged for Brown to have legal counsel to appeal SSA's decision. HLI0100; HLI0478. SSA denied her first appeal. HLI0307.

By April 29, 2010, Dr. Grader-Beck had determined that most of Brown's medical conditions were improved; he identified only sarcoidosis, arthralgias,[6] and dry cough as continuing "Problems/Diagnoses." HLI0323. She complained of left-ankle pain, but Dr. Grader-Beck found "no clear sign of any inflammatory process." *Id.* He also noted that the dry cough could be a "recurrence of pulmonary involvement with her sarcoidosis," though he "believe[d] that it [was] unlikely." *Id.* Four months later, on August 26, 2010, Dr. Grader-Beck signed an Attending Physician's Statement of Functionality, which listed sarcoidosis as Brown's primary diagnosis, "joint pain [and] fatigue" as her subjective symptoms, and erythema nodosum and ankle arthritis as his physical examination findings. HLI0318. He described Brown's condition as "Improved" and said that she was capable of sitting, standing, and walking for one to two hours at a time for a total of nine hours per day. HLI0319. She could also occasionally lift up to 20 pounds, bend at her waist, kneel, crouch, and drive. *Id.*

---

[6] An "arthralgia" is a "[p]ain in a joint." STEDMAN'S at 149.

5

In light of these positive changes in Brown's condition, Hartford arranged for a Vocational Rehabilitation Counselor to analyze her ability to work a job. The resulting Employability Analysis Report ("EAR") confirmed that she was capable of handling the demands of at least six occupations including histotechnologist. HLI0308–14. Accordingly, on September 27, 2010, Hartford notified Brown that she did not qualify for LTD benefits beyond September 30. HLI0143–47.

Brown appealed the decision in a letter dated March 23, 2011, wherein she stated that Drs. Grader-Beck and Julie Paik had diagnosed her with fibromyalgia.[7] HLI0305. Newly-submitted medical records from Drs. Grader-Beck and Paik dated October 28, 2010 indicated that Brown had complained of worsening pain in her ankles and hips, and that "only staying still [made] the pain better." HLI0293. She also complained of dry cough. *Id.* The doctors noted that there was "no clear sign of any inflammatory process" and that plaintiff "[did] *not* meet the criteria for fibromyalgia." HLI0294 (emphasis added). "Problems/Diagnoses" were the same as on April 29, 2010: sarcoidosis, arthralgias, and dry cough. HLI0294–95.

In a March 13, 2011 report, Drs. Grader-Beck and Paik reported no abnormalities in either the MRI on Brown's hips or the pulmonary function tests used to assess her dry cough. HLI0296. A CT scan of her chest was also clear. *Id.* She did complain about general stiffness and pain, but she said nothing about her prior hip pain. HLI0296–97.

---

[7] "Fibromyalgia" is "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause." STEDMAN'S at 671. Per the American College of Rheumatology, the diagnostic criteria for fibromyalgia "include pain on both sides of the body, both above and below the waist . . . ; additionally there must be point tenderness in at least 11 of 18 specified sites." *Id.*

6

Moreover, her sarcoidosis was "essentially in remission." HLI0297. Finally, Dr. Grader-Beck noted that Brown had "multiple tender points . . . consistent with fibromyalgia," *id.*, though he did not report "point tenderness in at least 11 of 18 specified sites," as required to formally diagnose the condition, *see supra* note 7. The report, as initially drafted by Dr. Paik, said that "[p]laintiff is disabled from her fibromyalgia at this point in time," but Dr. Grader-Beck's addendum was less certain about that diagnosis: "I am worried that she has developed fibromyalgia." HLI0298.

In late May, another rheumatologist, Dr. Asian Mubashir, began treating Brown's sarcoidosis—which Dr. Grader-Beck had determined was in remission months earlier. HLI0277. Dr. Mubashir never diagnosed Brown with fibromyalgia or opined that she was disabled. On June 6, 2011, a Dr. Marc Schlosberg interpreted the results of a nerve conduction study and found that the test "demonstrate[d] a very mild, mainly demyelinating neuropathy."[8] HLI0271. Just two days later, Brown started visiting yet another doctor, Dr. Janaki Kalyanam, who on June 29, 2011 certified without explanation that plaintiff was unable to return to work. HLI0275. On July 18, 2011, Dr. Navdeep Mathur signed a medical assessment form, offering a much bleaker view of Brown's condition than had Dr. Grader-Beck or the nerve conduction study. HLI0254–56. In the five places where the form asked for the "medical findings/diagnosis that support[ed his]

---

[8] A "neuropathy" is "[a] classical term for any disorder affecting any segment of the nervous system." STEDMAN'S at 1211. "Demyelination" is the "[l]oss of myelin," *id.* at 472, with "myelin" being "a mixture of proteins and phospholipids forming a whitish insulating sheath around many nerve fibers, increasing the speed at which impulses are conducted," NEW OXFORD at 1123.

assessment," Dr. Mathur wrote only "patient's history." HLI0254–55. There is no indication that Dr. Mathur personally examined Brown before citing a "presumptive diagnosis [of] fibromyalgia." HLI0256. Dr. Janaki Kalyanam signed a nearly identical form three days later. HLI0257–59. She noted that "fibromyalgia" and a "recent diagnosis" supported her assessment of plaintiff's impairment, but like Dr. Mathur, she provided no details of any medical examination or treatment. *Id.*

Hartford referred Brown's case to an independent rheumatologist, Dr. Chelsea I. Clinton, who "reviewed all information, records and data provided . . . by [Hartford]" and attempted on several occasions to talk with Drs. Grader-Beck, Kalyanam, and Mubashir, none of whom returned her calls. HLI0229–30. Based on plaintiff's medical history—which Dr. Clinton summarized at the outset of her report, HLI0229—she concluded that Brown "does maintain the functional capability to consistently perform work activities for eight hours per day, 40 hours per week on a sustained basis." HLI0231.

The following day, Hartford denied Brown's appeal. HLI0130–34. In reaching its decision, Hartford said, it had "considered not only the medical information provided but information you provided us, as well as the opinion of your treatment providers and review by the independent physician and provisions of the [LTD] contract." HLI0134.

Months later, SSA granted Brown's application for Social Security disability ("SSD") benefits.[9] A Hartford representative warned plaintiff, however, that "SSD is

---

[9] Plaintiff says SSD granted her award in November 2011, *see* Compl. ¶ 32; whereas defendant says December 27, 2011, *see* Def. Hartford Life and Accident Ins. Co.'s Mem. in Opp'n to Plf.'s Mot. for Summ. J. at 8 [Dkt. #31]. The distinction is immaterial.

8

considered a direct offset to her benefits with [Hartford] and that if SSD [is] retro[actively] awarded, she would have an [overpayment] . . . that she would be required to pay back." HLI0065; *see also* HLI0037–38; HLI0041 ("overpayment" provisions).

Brown now moves for summary judgment on her claim that Hartford's decision to terminate her LTD benefits violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). *See* Compl. ¶¶ 33–37. She seeks reinstatement of her LTD benefits retroactive to August 16, 2011, an order directing Hartford to continue paying her LTD benefits until the policy terminates or plaintiff reaches retirement age, declaratory relief, and an award of costs and attorney's fees. *See id.* ¶ 37. Hartford counterclaims for reimbursement of LTD benefits paid during months in which plaintiff retroactively received SSD benefits. *See* Answer ¶¶ 51–74. As to all claims, defendants have the better argument.

## LEGAL STANDARD

### A. Plaintiff's ERISA Claim

The parties agree that, because plaintiff's insurance plan gave Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy," HLI0049, the decision to terminate Brown's LTD benefits is subject to a "plainly deferential" standard of review. Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. as to Pl.'s Compl. & Def.'s Countercl. ("Pl.'s Mem.") at 13–14 [Dkt. #29-1]; *see also* Def.'s Mem. at 14–15 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Whether called an "arbitrary and capricious" or

"abuse of discretion" standard, the focus of the inquiry is the same: *reasonableness*. *See Moore v. CapitalCare, Inc.*, 461 F.3d 1, 11 (D.C. Cir. 2006); *Costantino v. Wash. Post Multi-Option Benefits Plan*, 404 F. Supp. 2d 31, 38 & n.7 (D.D.C. 2005). Under this standard, a reviewing court may not overturn a reasonable decision to terminate benefits, even if it believes the opposite outcome also might have been reasonable. *See Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1452 (D.C. Cir. 1992). An alleged conflict of interest is a factor to be considered in the reasonableness inquiry, but it does not change the standard of review or any other burden-of-proof, procedural, or evidentiary rule. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–17 (2008).[10]

### B. Defendant's Counterclaim

Hartford's counterclaim for repayment is subject to familiar summary judgment standards. The Court grants a motion for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

---

[10] "[I]n an ERISA case, when the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *James v. Int'l Painters & Allied Trades Indus. Pension Plan*, 844 F. Supp. 2d 131, 141 (D.D.C. 2012) (citations and internal quotation marks omitted).

(internal quotation marks omitted). If Hartford meets this burden, I must grant summary judgment unless Brown can "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

## ANALYSIS

### A. Plaintiff's ERISA Claim

The question before me is a straightforward one: Was Hartford's decision to terminate Brown's LTD benefits reasonable in light of the evidence and arguments before it at the time?[11] I find that it was.

First, it is clear from the record that Hartford took into account all of the medical evidence that plaintiff had provided, as well as all other appropriate non-medical evidence. Brown points to only one ailment—fibromyalgia—that Hartford allegedly failed to consider. *See* Pl.'s Mem at 16–18. Unsurprisingly, Hartford did not mention fibromyalgia when it first terminated plaintiff's benefits because she had not yet presented any medical evidence that she suffered from that condition. *Compare* HLI0143–47 (benefits terminated September 30, 2010), *with* HLI0293–95 (fibromyalgia first mentioned October 28, 2010). Brown provided medical records relating to fibromyalgia only *after* she appealed Hartford's termination of benefits, and Hartford explicitly addressed those records when it denied her appeal. *See* HLI0130 (listing "[a]dditional medical information provided by Dr. Mathur, Dr. Grader-Beck, [and] Dr.

---

[11] "When an administrator's decision is reviewed for abuse of discretion, the scope of review is limited to the evidence before the administrator." *Siegel v. Conn. Gen. Life Ins. Co.*, 702 F.3d 1044, 1049 (8th Cir. 2013); *see also Broberg v. Aetna Life Ins. Co.*, 12 F.3d 204, 204 (4th Cir. 1993).

11

Kalyanam" as evidence considered).[12]

Hartford was not required to grant plaintiff's appeal and reinstate her benefits merely because she offered some evidence of a new condition. As a plan administrator with discretion under the terms of the agreement, Hartford was free to look beyond the treating physicians' conclusions and "choose among conflicting evidence" to reach any conclusion that was "reasonably supported by the administrative record." *Mobley v. Cont'l Cas. Co.*, 405 F. Supp. 2d 42, 47–48 (D.D.C. 2005) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 829 (2003)); *see also id.* at 48 ("[I]f the medical evidence is close and supports both conclusions, then judicial deference would support the plan administrator's decision to deny the plaintiff's benefits.").

In this case, Hartford was faced with conflicting evidence. Weighing in plaintiff's favor was Dr. Grader-Beck's March 13, 2011 report, wherein the doctor concluded that plaintiff was "disabled from her fibromyalgia" based on a finding of "multiple tender points ... consistent with fibromyalgia." HLI0297–98. Plaintiff also had a letter and a Disability Certificate from Dr. Kalyanam that said she could not return to work. *See* HLI0274–75. And plaintiff offered medical assessments forms signed by Drs. Mathur and Kalyanam, which stated that her physical abilities were dramatically limited by the fibromyalgia that had been previously diagnosed by another doctor. *See* HLI0254–59.

---

[12] *See also* HLI0132–33 ("[W]e received additional information including a report from Dr. Mathur dated May 4, 2011 reporting you had recently been diagnosed with fibromyalgia by your rheumatologist at Johns Hopkins [Dr. Grader-Beck].... It's reported [that] you did have multiple tender points *consistent with* fibromyalgia. It's reported that you are disabled due to fibromyalgia .... Dr. Mathur reported your diagnosis is *presumed to be* fibromyalgia." (emphases added)).

12

Upon closer scrutiny, however, these documents could reasonably be viewed as inconclusive at best. First, and most importantly, Dr. Grader-Beck's report does not say that plaintiff actually met the diagnostic criteria for fibromyalgia.[13] Instead, it jumps from a finding of "multiple tender points" to a conclusory statement that plaintiff is disabled. HLI0297–98. The report—which Dr. Grader-Beck did not dictate in the first instance—then ends with his arguably ambiguous note that he was *"worried that [plaintiff] has developed fibromyalgia,"* suggesting some uncertainty about the diagnosis. HLI0298 (emphasis added). It does not contain any assessments of plaintiff's ability to perform tasks or function in the workplace. *Compare* HLI0296–98, *with* HLI0318–19.

Even assuming plaintiff suffered from fibromyalgia, it does not necessarily follow that she was disabled; rather, it was plaintiff's burden to substantiate her claim for benefits. *See, e.g., O'Bryan v. Consol. Energy, Inc.*, 477 F. App'x 306, 308–09 (6th Cir. 2012); *Tortora v. SBC Commc'ns, Inc.*, 446 F. App'x 335, 338–39 (2d Cir. 2011). Drs. Kalyanam's and Mathur's medical assessments provide superficial indicia of plaintiff's physical limitations but they appear to rely entirely on "patient's history" and Dr. Grader-Beck's recent "presumptive diagnosis of fibromyalgia." HLI0254–59. There is no indication that either doctor ever evaluated plaintiff or reached his own conclusion as to

---

[13] *Compare* HLI0297–98 (referring to "multiple tender points" without specifying their location, number, or duration), *with DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 863 n.1 (4th Cir. 2011) ("Fibromyalgia is diagnosed based on tenderness of at least eleven of eighteen standard trigger points on the body." (internal quotation marks omitted)), *and Williams v. United of Omaha Life Ins. Co.*, No. 2:11cv3948, 2013 WL 5519525, at *4 (N.D. Ala. Sept. 30, 2013) ("[F]or a diagnosis of fibromyalgia, the American College of Rheumatology requires a minimum of eleven out of eighteen specified tender points in all four quadrants with chronic pain lasting a minimum of three months.").

whether plaintiff had fibromyalgia. *See id.* Nor are there any test results or other objective findings to substantiate any of their conclusions. Less valuable still, Dr. Kalyanam's two-sentence letter and one-page form-certificate contain nothing even resembling a physical assessment, medical finding, or diagnosis. *See* HLI0274–75.[14]

There was additional evidence supporting Hartford's decision, as well. First, on April 29 and August 26, 2010, Dr. Grader-Beck reported that plaintiff's condition had improved dramatically, *see* HLI0322–24; HLI0318–19, to the point where an Employability Analysis Report showed that she was capable of meeting the demands of several occupations including histotechnologist, *see* HLI0308–14.[15] On March 13, 2011, Dr. Grader-Beck reported that Brown's sarcoidosis was in remission and that an MRI and pulmonary function test had turned up no abnormalities. *See* HLI0296–97. Three months later, a nerve conduction study showed that Brown had only a *"very mild . . . neuropathy."* HLI0271 (emphasis added). In addition, Hartford's surveillance showed that as early as November and December 2009, Brown was physically capable of a wide range of activities—walking, running, driving, carrying trash and shopping bags with one hand, preparing food, and caring for (even *lifting* and *holding*) a child—all without signs

---

[14] *See also O'Bryan*, 77 F. App'x at 309 ("The defendants were not obliged to accord special deference to the treating doctors, particularly where those doctors did not document the evidence supporting their conclusions. Requiring objective evidence of disability is not irrational or unreasonable." (citation omitted)).

[15] It is irrelevant that Universal may impose high demands on its histotechnologists because under plaintiff's LDT policy, she is disabled only if she cannot perform "one or more of the Essential Duties of" her "Occupation," HLI0040, with "Occupation" defined as the "Occupation as it is recognized in the general workplace," not "the specific job [the insured is] performing for a specific employer or at a specific location," HLI0043.

14

of pain. *See* HLICIU0651–60. These observations took place just two and six weeks after Brown reported to Hartford that she was not receiving other income and "doesn't [d]o much of anything" other than bathe and "some reading."[16] HLI0103. Lastly, Hartford obtained an independent assessment by a reviewer, Dr. Chelsea Clinton, who—based on a review of the entire medical record[17] and after making repeated efforts to speak with several of Brown's care providers—concluded that the evidence did *not* support plaintiff's claim. *See* HLI0231. It was perfectly reasonable and permissible for Hartford to give significant weight to Dr. Clinton's opinion, despite the fact that she never personally examined plaintiff.[18]

---

[16] Although not explicitly mentioned in Hartford's termination letters, the surveillance records were part of plaintiff's claim file, which Hartford "reviewed in its entirety." HLI0130; *see also* HLI0145. Courts have recognized that plan administrators may reasonably consider surveillance when assessing the credibility and accuracy of disability claims and physicians' assessments. *See, e.g., Finley v. Hartford Life & Accident Ins. Co*, 400 F. App'x 198, 200 (9th Cir. 2010); *Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 228–30 (1st Cir. 2010). Notably, Brown never says that Hartford's inferences from the surveillance—that she was caring for a child and selling food out of her home—are wrong. *See* Mem. of P. & A. in Opp'n to Pl.'s Mot. for Summ. J. at 4–5 [Dkt. #33]. Hartford, meanwhile, provides ample support for its conclusions. *See* Def. Hartford Life and Accident Ins. Co.'s Reply Br. in Further Supp. of Its Mot. for Summ. J. at 7–10 [Dkt. #34].

[17] Dr. Clinton clearly did not overlook Dr. Grader-Beck's fibromyalgia diagnosis because she explicitly referenced it in her clinical summary. *See* HLI0229. And even if I were convinced that Dr. Clinton missed certain medical evidence, it is clear that Hartford—the relevant decisionmaker in this matter—considered "all of the medical records," meaning "not only the medical information provided but information [plaintiff] provided . . ., as well as the opinion of [her] treatment providers." HLI0134. In addition, both Hartford and Dr. Clinton appropriately considered plaintiff's lack of medication only as evidence that she was not impaired by side effects; they did not treat it as proof that she was able to work. *See id.*; HLI0231.

[18] *See, e.g., Black & Decker*, 538 U.S. at 823 ("Nothing in ERISA . . . suggests that plan administrators must accord special deference to the opinions of treating physicians, or imposes a heightened burden of explanation on administrators when they reject a treating physician's opinion."); *Marcin v. Reliance Standard Life Ins. Co.*, 895 F. Supp. 2d 105, 120 n.7 (D.D.C.

I readily acknowledge that it was within Hartford's discretion to credit Dr. Grader-Beck's conclusory disability finding and the superficial assessments provided by Drs. Kalyanam and Mathur. But that does *not* mean it was *unreasonable* for Hartford to weigh the evidence differently and reach the opposite conclusion. Based on my review of everything that Hartford had in front of it, I am satisfied that its decision was "reasonably supported by the administrative record." *Mobley*, 405 F. Supp. 2d at 48.

Finally, I must consider as a factor in my reasonableness analysis Hartford's conflicting interests as "a plan administrator [that] both evaluates claims for benefits and pays benefits claims." *Glenn*, 554 U.S. at 112. I find that this is a case in which the conflict is "less important (perhaps to the vanishing point)" because Hartford took "active steps to reduce potential bias and to promote accuracy," *id.* at 117, for instance, by setting up multiple levels of review by different individuals, *see* HLI0066; HLI0078–79, and by seeking input from a neutral third-party reviewer (Dr. Clinton) who had no personal stake in the outcome, *see* HLI0231.

Moreover, plaintiff provides "no evidence that Hartford has a history of biased claims administration," *Smith v. FedEx Freight E., Inc.*, No. 08cv1905, 2010 WL 456779, at *6 (M.D. Pa. Feb. 1, 2010), or "that any alleged self-interested behavior

---

2012) ("[I]nsurance companies are entitled to rely on written reports of consultants who have done paper reviews of a claimant's medical records to rebut the opinion of the treating physician asserting [that] claimant is disabled." (internal quotation marks omitted)); *Williams v. UNUM Life Ins. Co. of Am.*, 250 F. Supp. 2d 641, 649 (E.D. Va. 2003) (holding that plan administrator did not abuse discretion by relying on reviewing physician because "the conclusions of plaintiff's treating physicians were based almost entirely on plaintiff's subjective complaints of pain for which there was insufficient objective corroboration" and "[a]lthough a treating physician must accept a patient's subjective complaints, the same is not required of a plan administrator in determining eligibility for benefits.").

actually affected" its decision in this case, *see Wright v. Metro. Life Ins. Co.*, 618 F. Supp. 2d 43, 58–59 (D.D.C. 2009) (internal quotation marks omitted); *see also Becker v. Weinberg Grp., Inc. Pension Trust*, 473 F. Supp. 2d 48, 62 (D.D.C. 2007). To the contrary, it is undisputed that Hartford awarded plaintiff benefits in January 2009, *see* HLI0210–14; gave her ample opportunity to provide any new medical evidence as it came available, *see, e.g.*, HLI0162–209;[19] reinstated her benefits after she failed to substantiate her disability in July 2010, *see supra* note 19; HLI0148–49; and even granted her additional time to perfect her appeal, *see* HLI0140 (extending deadline 45 days); HLI0276 (request for additional time); HLI0138 (letter indicating evidence accepted until July 21, 2011). None of these actions were in Hartford's interest, and they therefore provide strong indications that Hartford endeavored to administer the plan fairly. *See Bendik v. Hartford Life Ins. Co.*, No. 03cv8138, 2010 WL 2730465, at *4–5 (S.D.N.Y. July 12, 2010).[20]

---

[19] Plaintiff characterizes Hartford's letters as "bombard[ing her] with requests for further documentation," Pl.'s Mem. at 14, yet she is conspicuously silent on whether she or Dr. Grader-Beck responded to the letters in a timely fashion. The record shows that they did not. In July 2010, Hartford terminated plaintiff's benefits because she and Dr. Grader-Beck had failed to provide updated medical information sufficient to extend her benefits beyond July 31, 2010. HLI0154–58. In September 2010, plaintiff submitted her paperwork, and defendant reinstated her benefits, retroactive to August 1. HLI0148–49.

[20] There is no evidence whatsoever that "Hartford rushed their termination letter to ensure that it was issued prior to the Social Security ruling on Ms. Brown's appeal." Pl.'s Mem. at 16. Although it may have been unreasonable for Hartford to ignore a favorable SSA decision had one been rendered already, *see Glenn*, 554 U.S. at 118, plaintiff cites no authority for the proposition that Hartford was required to indefinitely delay its administrative processes while Brown exhausted every possible SSD appeal. *See, e.g., Benningfield v. Hartford Life & Accident Ins. Co.*, No. 4:11cv00087, 2012 WL 2368165, at *4 (W.D. Ky. June 21, 2012) ("Hartford was not obligated to wait for the SSA to make a decision regarding Benningfield's LTD benefits. . . .

B. **Defendant's Counterclaim**

Finally, Brown does not contest Hartford's counterclaim or present any evidence contrary to Laurie Tubbs's affidavit. *See supra* note 1. Plaintiff asks only that her repayments be deducted from Hartford's future LTD benefit payments. But Hartford is not required to make further payments. Accordingly, plaintiff must reimburse Hartford $36,473.40 to offset her retroactive SSD payments.[21] *See* HLI0037–38; HLI0041.

## CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment [Dkt. #27] will be GRANTED, and plaintiff's Motion for Summary Judgment [Dkt. #29] will be DENIED. Judgment will be entered in favor of defendants on plaintiff's claims, as well as defendant's counterclaim in the amount of $36,473.40. An appropriate order shall accompany this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge

---

[T]he [SSA]'s decision awarding benefits to Benningfield is not a relevant factor in determining whether Hartford was arbitrary and capricious in denying Benningfield's claim."). Furthermore, I am not "bound to take into account the [SSA]'s determination," Pl.'s Mem. 16, because it was not before Hartford at the time defendant made its decision. *See supra* note 11.

[21] This outcome should come as no surprise to plaintiff. She acknowledges in her brief that she was warned "she might owe the Hartford money" if she received SSD benefits. Pl.'s Mem. at 15; *see also* HLI0065.